**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NORTH JERSEY MEDIA GROUP INC.,

                      Plaintiff,

v.

JEANINE PIRRO and FOX NEWS
NETWORK, LLC,

                      Defendants.

Index No.: 13-CV-07153 (ER)(FM)

**REDACTED**

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HOGAN LOVELLS US LLP
Dori Ann Hanswirth
   dori.hanswirth@hoganlovells.com
Nathaniel S. Boyer
   nathaniel.boyer@hoganlovells.com
Benjamin A. Fleming
   benjamin.fleming@hoganlovells.com
875 Third Avenue
New York, New York 10022
tel: (212) 918-3000
fax: (212) 918-3100
*Attorneys for Defendants*

**(FILED UNDER SEAL)**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND..................................................................................................4

    A.    The Purpose of the Work Was to Report on a Breaking News
Story.................................................................................................................4

    B.    Fox News Posted a Partial Version of the Work in Combination
with Another Work for the Purpose of Commentary..................................5

    C.    Plaintiff Licenses the Work—Sometimes for Free—But Does Not
Pursue Many Perceived Infringements. .....................................................7

ARGUMENT..........................................................................................................................9

DEFENDANTS' USE OF A PORTION OF PLAINTIFF'S WORK FOR THE EXPRESSIVE
PURPOSE OF REMEMBERING SEPTEMBER 11, WITH A HISTORICAL CONNECTION,
WAS A FAIR USE ................................................................................................................9

    A.    Fair Use Creates the Breathing Space Needed to Protect
Expression Against Infringement Actions that Do Not Further the
Purposes of Copyright Law. ......................................................................10

    B.    Factor 1:  The "Purpose and Character" of Defendants' Use of the
Work Was for Commentary and Historical Remembrance, Which
Favors a Finding of Fair Use. ...................................................................12

          (1)    Defendants used the Work for purposes of "comment,"
creating a "strong presumption" that the first factor favors
Defendants. ....................................................................................13

          (2)    Defendants' use was "transformative" because it was done
for a purpose distinct from the original purpose for which
the Work was created......................................................................14

          (3)    Defendants' use of the Work, on a Facebook feed, to
express remembrance for September 11 was not a
"commercial" use............................................................................18

    C.    Factor 2:  The Factual Nature of Plaintiff's Work Favors a Finding
of Fair Use...................................................................................................20

D.      Factor 3:  Defendants' Use of the Key Elements of the Work
        Favors a Finding of Fair Use, or, at a Minimum, This Factor is
        Neutral.................................................................................................................22

E.      Factor 4:  Defendants' Use Does Not Usurp, or Serve as a
        Substitute For, Plaintiff's Work, and Thus the Fourth Factor
        Favors Defendants. ............................................................................................23

CONCLUSION...............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ................................................................................16

*Authors Guild, Inc. v. Google Inc.*,
    954 F. Supp. 2d 282 (S.D.N.Y. 2013) (Chin, J.) ("*Google Books*")............................... passim

*Authors Guild, Inc. v. HathiTrust*,
    12-4547-CV, 2014 WL 2576342 (2d Cir. June 10, 2014) ("*HathiTrust*") ..................... passim

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006).................................................................................. passim

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006)................................................................................... passim

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) .............................................................................................. passim

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 618 (2013) .................................... passim

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ......................................................................................................9

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
    499 U.S. 340 (1991)....................................................................................................21

*Golan v. Holder*,
    132 S. Ct. 873 (2012) .................................................................................................11

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ......................................20

*Hofheinz v. Discovery Commc'ns, Inc.*,
    00 CIV. 3802 (HB), 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001)...................................13, 23

*Kaplan v. Stock Mkt. Photo Agency, Inc.*,
    133 F. Supp. 2d 317 (S.D.N.Y. 2001)............................................................................11, 21

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ..........................................................................................6

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998)............................................................................................2

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)............................................................................9

*Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*,
935 F. Supp. 490 (S.D.N.Y. 1996)........................................................11, 12, 21

*NXIVM Corp. v. Ross Institute*,
364 F.3d 471 (2d Cir. 2004)..................................................4, 13, 23, 24

*Opals on Ice Lingerie v. Body Lines Inc.*,
320 F.3d 362 (2d Cir. 2003)....................................................................9, 24

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ...................................................................6

*Sony Corp. of America v. Universal City Studios, Inc.*,
464 U.S. 417, 451 (1984)..........................................................................20

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
12-2412-CV, 2014 WL 2219162 (2d Cir. May 30, 2014) ...............................passim

*Time Inc. v. Bernard Geis Assocs.*,
293 F. Supp. 130 (S.D.N.Y. 1968)...........................................................11

*Video-Cinema Films, Inc. v. Cable News Network, Inc.*,
98 CIV. 7128(BSJ), 2001 WL 1518264 (S.D.N.Y. Nov. 28, 2001)......................10

*Wade Williams Distribution, Inc. v. Am. Broad. Co., Inc.*,
00-cv-5002(LMM), 2005 WL 774275 (S.D.N.Y. Apr. 5, 2005).........................24

*Wright v. Warner Books, Inc.*,
953 F.2d 731 (2d Cir. 1991)..........................................................2, 13, 14

**STATUTES**

17 U.S.C. § 101...........................................................................................18

17 U.S.C. § 107....................................................................................passim

17 U.S.C. § 1202(c) .....................................................................................9

U.S. Const. amend I.....................................................................................11

U.S. Const., Art. I, § 8, cl. 8.........................................................................10

**FEDERAL RULES**

Fed. R. Civ. P. 56...................................................................................1, 9, 24

**OTHER AUTHORITIES**

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990) ................10

Tom Evers, *How to Protect Your Website from Image Theft*, GraphPaperPress,
    http://graphpaperpress.com/blog/protect-website-image-stealing/ (last accessed June
    24, 2014) ..................................................................................................................................9

Defendants Jeanine Pirro and Fox News Network, LLC submit this memorandum of law in support of their motion for summary judgment, pursuant to Fed. R. Civ. P. 56, on the ground that the complained-of use of plaintiff North Jersey Media Group Inc.'s allegedly copyrighted work was a "fair use" (the "Motion"). *See* 17 U.S.C. § 107.

## PRELIMINARY STATEMENT

This case is about an expression of remembrance on the twelfth anniversary of September 11, 2001. On that date, Georeen Tanner, Production Assistant for the Fox News commentary and news program "Justice with Judge Jeanine," located an image through a Google image search that combined two photographs: a photograph of three firefighters raising an American flag near the ruins of the World Trade Center in 2001, and a photograph of four U.S. Marines raising the American flag atop Mount Suribachi on Iwo Jima in 1945. Tanner posted the image as part of the Judge Jeanine Pirro Facebook feed to serve as a reminder on a day of national mourning and to convey a message of American resilience, through history, as symbolized by the American flag. Along with this image, Tanner added the well-known "#neverforget" hashtag to identify the topic of the posting and to signify Defendants'[1] participation in the global social media conversation that was taking place that day. Hundreds of people responded to the post with comments of their own. The image that Tanner obtained through the Google image search contained no references to Plaintiff, nor did it contain any watermark or metadata indicating that it should not be copied. The image contained the wording "concordville.org" on the lower right-hand side, signifying the Concordville Fire & Protection Association. Nothing was advertised, solicited, or sold in connection with this post. The post was removed from the Facebook feed

---

[1] As described herein, Fox News (through Tanner) posted the image to the Jeanine Pirro Facebook feed; Pirro was not involved. Indeed, Plaintiff has no evidence to support keeping Pirro as a defendant in this case, and for that reason alone the case against her should be dismissed. However, this Motion will refer to "Defendants'" fair use defense because, if it applies (and it does), then it would necessarily apply to either or both Defendants.

approximately two days later, after Pirro received a letter from Plaintiff's counsel asking that it be deleted.)

Notwithstanding the expressive and solemn purpose of the Facebook post, Plaintiff—a purported news organization claiming to own the copyright in a photograph of the firefighters at Ground Zero—has sued Defendants for copyright infringement. Defendants now move for summary judgment because their use of Plaintiff's work was fair and thus not infringing. 17 U.S.C. § 107. Because a balancing of the four statutory fair use factors weighs in Defendants' favor and there are no genuine issues of material fact, summary judgment is appropriate.[2]

First, the complained-of use was for the purpose of "comment," one of the enumerated examples of fair use set forth in the preamble of Section 107, and thus "there is a strong presumption that factor one favors the defendant." *Wright*, 953 F.2d at 736 (affirming summary judgment to defendant on fair use where defendant used portions of an author's unpublished letters in the context of a scholarly biography about the author); *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (reversing grant of summary judgment to plaintiff on fair use grounds where the defendant made a parody of the plaintiff's work). Moreover, the use was made for a different purpose from the original, and added something new to the original. While the photographer's original purpose was to report news as it was happening at Ground Zero, the

---

[2] *See Authors Guild, Inc. v. HathiTrust*, 12-4547-CV, 2014 WL 2576342 (2d Cir. June 10, 2014) ("*HathiTrust*") (affirming grant of summary judgment to defendant on fair use issue where no genuine issues of material fact remained); *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (same); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (same); *Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991) (same); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998) (same); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 12-2412-CV, 2014 WL 2219162, at *3 (2d Cir. May 30, 2014) (same, even though the plaintiff "had taken no discovery in the action"); *Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013) (*reversing* grant of summary judgment *to plaintiff*, granting for defendant for 25 of 30 works at issue; vacating summary judgment for the other five works), *cert. denied*, 134 S. Ct. 618 (2013).

Defendants' purpose was to convey a message of solemn remembrance that included a portion of the Work in combination with the historically famous Iwo Jima image. As such, Defendants' use is "transformative." *See, e.g.*, *Bill Graham Archives*, 448 F.3d at 609 (affirming grant of summary judgment to defendant on fair use where defendant used reduced-size version of the plaintiff's Grateful Dead concert posters in a book about the band). For these reasons, and because Defendants did not engage in a "direct commercialization of [the] copyrighted works," *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 292 (S.D.N.Y. 2013) (Chin, J.) ("*Google Books*"), the first statutory factor favors Defendants.

Second, the allegedly infringed work is a factual work; it was originally published on September 12, 2001, and has developed into a symbol of what happened the day prior. The reason that the image is powerful is because of what the weary, shocked firefighters had the presence of mind to do on that horrific day. In the midst of terror, death, and despair, the firefighters decided to raise the American flag. The flag-raising at that moment served as a beacon of hope and national unity—and as a tribute to the many law enforcement officers and civilians who gave their lives that day. Plaintiff cannot claim ownership in the firefighters' actions; the expressions on their faces; their ashen uniforms; or the American flag. Rather, to the extent that Plaintiff has a protectable interest in this photograph at all, that interest is limited to those elements of the work that emanate from the photographer's shooting choices, such as type of camera, lens, angle, and shutter speed. The second statutory fair use factor thus favors Defendants.

Third, Defendants used what they needed of the Work in order to convey their message. *See Bill Graham Archives*, 448 F.3d at 613 (copying entire work does not weigh against defendant where "copying the entirety of a work is . . . necessary to make a fair use of the

image"). Defendants used a cropped, low-resolution portion of Plaintiff's work, along with a portion of a separate work, to convey the message that we should never forget the tragedy. As such, the third statutory fair use factor favors Defendants.

Fourth, Defendants' use of a partial, low-resolution image neither serves as a "substitute," *HathiTrust*, 2014 WL 2576342, at *7, nor "usurps the market" for the original, *NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 482 (2d Cir. 2004). Rather, the evidence shows that Plaintiff continues to both allow unlicensed uses of the type that Defendants made, and to license the original work, both for free and for a fee. In fact, Plaintiff did not enforce its alleged rights in the Work *at all* for more than eight years (from 2003 through 2012). Thus, the fourth statutory fair use factor also favors Defendants and the Motion should be granted.

## FACTUAL BACKGROUND

### A.      The Purpose of the Work Was to Report on a Breaking News Story.

Plaintiff claims that it publishes New Jersey-based newspapers *The Record* (Bergen County) and *Herald News*, and is engaged in news reporting. (¶¶ 1, 2.)[3] On September 11, 2001, Plaintiff assigned photojournalist Thomas E. Franklin ("Franklin") to cover the events taking place at the World Trade Center. (¶¶ 3, 4.) While there, Franklin photographed three firefighters raising an American flag near the ruins of the World Trade Center (the "Work"), along with dozens of other photographs depicting the events of that day. (¶ 5.) Plaintiff alleges it owns the copyright in the Work, and it has registered its copyright in the Work with the United States Copyright Office. (¶ 5.) The Work first appeared in *The Record*—specifically, on Page A32 of the September 12, 2001 edition, where it occupied approximately 65 percent (or 112 square inches) of the broadsheet page. (¶ 7.) Page A32 was the back page of a section of the newspaper and included four other photographs portraying the events of September 11, 2001; a

---

[3] Citations to "¶ __" refer to Defendants' Local Rule 56.1 Statement of Undisputed Facts.

large headline reading "Lives forever altered"; and a smaller "section" header across the top of the page reading "Attack on America."  (¶¶ 7, 8.)

### B.    Fox News Posted a Partial Version of the Work in Combination with Another Work for the Purpose of Commentary.

Pirro hosts *Justice with Judge Jeanine* ("*Justice*"), a weekly live news and commentary program on the Fox News Channel, a cable news channel operated by Fox News.  (¶ 12.)  *Justice* offers legal insights and analysis of recent news stories.  (¶ 12.)  One outlet for written and photographic content associated with *Justice* is the Judge Jeanine Pirro Facebook feed available through the Facebook social media platform (the "Facebook Feed").  Tanner manages Pirro's Facebook presence.  (¶ 13.)  Content made available through the Facebook Feed appears on the "News Feeds"[4] of users who have previously "liked" the Judge Jeanine Pirro Facebook page, located at the uniform resource locator https://www.facebook.com/judgejeaninepirro ("Jeanine Pirro Facebook Page").  (¶¶ 13, 14.)  From their own News Feeds, Facebook users can read, like, comment on, or share the Facebook Feed posts.  (¶ 16.)  Facebook users who subscribe to the Facebook Feed would, generally, not have a reason to browse to the Jeanine Pirro Facebook Page itself—and thus, would not see the banner image at the top of the page that features a photograph of Pirro and the date and time of the *Justice* program.  (¶¶ 15, 17.)  Indeed, Plaintiff has no evidence that any member of the public who viewed the complained-of posting did so by visiting the Jeanine Pirro Facebook Page.

On September 11, 2013, Tanner wanted to commemorate the anniversary of September 11, 2001 by making a post to the Facebook Feed.  (¶¶ 19, 20.)  She ran a Google image search

---

[4] A Facebook user's "News Feed" is "a constantly updating list of stories from people and Pages that [the user] follow[s] on Facebook."  Facebook, *How News Feeds Work*, https://www.facebook.com/help/327131014036297/ (last accessed June 21, 2014).

for "9/11" (the "Google Search"), looking for an image to help convey her message. (¶ 20.)[5] Tanner wanted to convey a message to honor solemn and tragic moments in American history. (¶ 20.) The Google Search provided many images related to the September 11 attacks, including at least one image of the Work; Tanner had seen the Work in the past as news of the day and in a historical context. (¶ 21.)

    In the results of the Google Search, Tanner also saw an image that was similar to the Work, but which added a different photograph depicting four American soldiers raising the American flag on Iwo Jima during World War II (*"Raising the Flag on Iwo Jima"*). (¶ 23.) Tanner had not seen the combined image (the "September 11/Iwo Jima Image") before, but recognized the background and liked the connection that it made between two important moments in American history. (¶¶ 23, 24.) She specifically chose to use the September 11/Iwo Jima Image because of this historical connection and message. (¶ 24.) Tanner noticed that the image contained no restrictions on copying, either on the face of the image or within its metadata. (¶ 25.) When she right-clicked on the image, she did not receive any prompt indicating that the image could not be downloaded. (¶ 25.) The lower right-hand side of the image says "concordville.org," which is a reference to a Pennsylvania fire department. (¶¶ 26, 27.)

---

[5] Google's display of thumbnail images in search results has been found to be a fair use by the United States Court of Appeals for the Ninth Circuit. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007). As that Court reasoned, a search engine's publication of low-resolution, thumbnail copies of images is "highly transformative" because the thumbnails are "incorporate[ed] . . . into a new work, namely, an electronic reference tool." *Id.*; *see Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 822 (9th Cir. 2003) ("We hold that [defendant's] reproduction of [plaintiff's] images for use as thumbnails in [defendant's] search engine is a fair use under the Copyright Act."). The Court of Appeals has favorably cited these decisions. *See Swatch Grp. Mgmt. Servs. Ltd.*, 2014 WL 2219162, at *8 (citing *Perfect 10, Inc.* with approval in fair use case); *HathiTrust*, 2014 WL 2576342, at *5 (citing *Perfect 10, Inc. and Kelly* with approval in fair use case).

On September 11, 2013, Tanner posted the September 11/Iwo Jima Image to the Facebook Feed. (¶ 28.) The resolution of the September 11/Iwo Jima Image is 480 pixels wide by 588 pixels high, which is a lower resolution than the original Work. (¶ 29.) Tanner did not post the September 11/Iwo Jima Image to promote the *Justice* program, or to encourage anyone to purchase anything; no one directed her to post it. (¶ 37.)[6] She did so to express her feelings and to reach out to others—and the post garnered hundreds of comments. (¶ 36.) Tanner added the phrase "#neverforget" to the posting to convey participation in the global conversation that was taking place on social media that day. (¶ 33.) A Facebook user will often add a phrase preceded by a hashtag to identify the topic to which the posting corresponds, signaling participation in the conversation on the topic on social media platforms. (¶ 33.) Not surprisingly, "#neverforget" was a popular hashtag that Tanner saw many times on social media that day, along with many other September 11 postings and images. (¶ 34.) Tanner did not seek permission from anyone to use the September 11/Iwo Jima Image, because she did not believe that she needed anyone's permission to use that image for her purposes of commentary and remembrance. (¶ 35.) Tanner removed the September 11/Iwo Jima Image from the Jeanine Pirro Facebook Page on or around September 13, 2013, when she learned that an attorney had written to Pirro asking that the image be deleted. (¶ 39.)

### C.   Plaintiff Licenses the Work—Sometimes for Free—But Does Not Pursue Many Perceived Infringements.

On September 19, 2002, when the Work had become more well-known, Malcolm Borg, Plaintiff's chairman, stated that ████████████████████████ (¶ 11.) Consistent with that, Plaintiff ████████████████████████████

---

[6] The events of September 11, 2001 were not discussed on the editions of *Justice* that aired on the Saturdays before and after the posting. The posting contained no information about any contents of *Justice*, or even when the next episode would be televised. (¶ 38.)

[REDACTED]

[REDACTED]. (¶ 47.)  Within months of Mr. Borg's statement, Plaintiff ceased all enforcement of its alleged rights in the Work until sometime in 2012.  (¶¶ 43, 44, 45.)

In 2001, Plaintiff began to license the Work, for both editorial and commercial purposes, in exchange for license fees. [REDACTED]

[REDACTED]

[REDACTED] (¶ 41.)  The resolution of the Work, as it is available through the AP, is 1348 pixels wide by 1792 pixels high.  (¶ 29.) [REDACTED]

[REDACTED]

[REDACTED] (¶ 41.)

Notwithstanding Plaintiff's licensing activity, there is widespread use of the Work on the internet that Plaintiff does not appear to pursue or attempt to prevent.  For example, the Work appeared as a search result in Tanner's Google image search.  (¶ 21.) [REDACTED]

[REDACTED] (¶ 43.)

[REDACTED]

[REDACTED] (¶ 44, 45.)  Plaintiff has produced no evidence that it ever contacted the Concordville Fire & Protection Association to inquire about its role in creating or posting the September 11/Iwo Jima Image, or to ask it to take the image down.  (¶ 46.)  The Work appears on Wikipedia with

8

no restrictions on copyright, or, indeed, no copyright management information at all.[7]  (¶ 48.)

The Work is so saturated on the internet that Plaintiff produced during discovery evidence of

██████████████████████████████████████.  (¶ 42.)

## ARGUMENT

## DEFENDANTS' USE OF A PORTION OF PLAINTIFF'S WORK FOR THE EXPRESSIVE PURPOSE OF REMEMBERING SEPTEMBER 11, WITH A HISTORICAL CONNECTION, WAS A FAIR USE

Summary judgment should be granted where "there is no genuine dispute as to any

material fact and . . . the movant is entitled to judgment as a matter of law." *Swatch Grp. Mgmt.*

*Servs. Ltd.*, 2014 WL 2219162, at *4 (quoting Fed. R. Civ. P. 56(a)); *see Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  A party cannot defeat a motion for summary judgment

"merely by making assertions that are conclusory or based on speculation." *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); *Opals*

*on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003) ("facts" that are

"fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative,

[or] merely suspicions" are insufficient to resist summary judgment).  Rather, a party can only

resist summary judgment with sworn statements "that would be admissible in evidence." Fed. R.

Civ. P. 56(c)(4).

Whether the use of a copyrighted work was "fair," 17 U.S.C. § 107, is a "mixed question

of law and fact" that "may [be] resolve[d] . . . at the summary judgment stage where there are no

---

[7] "Copyright management information" is a defined term in the Copyright Act.  It refers to "information conveyed in connection with copies . . . of a work . . . , including in digital form," such as the name, copyright holder, and any limitations on the use of the work.  17 U.S.C. § 1202(c).  There are a number of ways a copyright holder can incorporate this information into a webpage or photograph, as well as technical measures that a copyright holder can deploy to prevent people from downloading a copy of its photograph.  Tom Evers, *How to Protect Your Website from Image Theft*, GraphPaperPress, http://graphpaperpress.com/blog/protect-website-image-stealing/ (last accessed June 24, 2014).  Plaintiff does not appear to have taken any of these steps.

genuine issues of material fact." *Bill Graham Archives*, 448 F.3d at 608 (affirming grant of summary judgment to defendant on issue of fair use); *see supra* note 2.  Indeed, in only the past month, the Court of Appeals has issued two opinions affirming a grant of summary judgment to defendants on the issue of fair use. *See HathiTrust*, 2014 WL 2576342 (collection of libraries that scanned entire books for purposes of digital indexing); *Swatch Grp. Mgmt. Servs. Ltd.*, 2014 WL 2219162 (entire work, unaltered, copied and distributed through research portal; summary judgment granted even though there had been "no discovery in the action").  "The mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues *to be tried*." *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, 98 CIV. 7128(BSJ), 2001 WL 1518264, *5 (S.D.N.Y. Nov. 28, 2001) (emphasis in original) (use of film clips in news segment concerning then-recent death of Robert Mitchum a fair use).

As discussed below, there are no genuine issues of material fact in this case that preclude entry of summary judgment in Defendants' favor on the issue of fair use.

### A.   Fair Use Creates the Breathing Space Needed to Protect Expression Against Infringement Actions that Do Not Further the Purposes of Copyright Law.

Copyright is a statutory creation that exists for one purpose, dictated by the Constitution: "To promote the Progress of Science and useful Arts." *Campbell*, 510 U.S. at 575 (quoting U.S. Const., Art. I, § 8, cl. 8).  Copyright is "not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations.  It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public." *HathiTrust*, 2014 WL 2576342, at *4 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990)).  Copyright "furthers this core purpose by granting authors a limited monopoly over (and thus the opportunity to profit from) the dissemination of their original works of

authorship." *HathiTrust*, 2014 WL 2576342, at *5.

With regard to photographs, that "limited monopoly" does not apply to the subject matter of what is depicted in the photograph, but only to elements such as "posing the subjects, lighting, angle, selection of film and camera, [and] evoking the desired expression." *Kaplan v. Stock Mkt. Photo Agency, Inc.*, 133 F. Supp. 2d 317, 323 (S.D.N.Y. 2001). This limitation is especially important in the context of works depicting historical events; "history has its demands," and "[t]here is a public interest in receiving information concerning the world in which we live." *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (denying preliminary injunction on ground that use of "Rumble in the Jungle" footage in biography about Muhammed Ali was likely fair); *see Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130 (S.D.N.Y. 1968) (use of Zapruder film a fair use in light of "public interest in having the fullest information available on the murder of President Kennedy"; summary judgment granted to defendant). If the copyright holder's rights were absolute, then copyright law would run afoul of the First Amendment guarantee of free speech. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012) (labeling "fair use" one of the Copyright Act's "built-in First Amendment accommodations").

Fair use serves the important role of shielding speech from infringement actions that do not serve the purposes of the Copyright Act; it "mediates between the property rights [that copyright law] establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them—or ourselves by reference to the works of others, which must be protected up to a point." *Cariou*, 714 F.3d at 705 (citation omitted). Since the passage of the British Statute of Anne of 1709, courts have "recognized that certain instances of unauthorized reproduction of copyrighted material, first described as fair

11

abridgment, . . . would not infringe the author's rights." Leval, *supra*, at 1105; *see Blanch*, 467

F.3d at 250 ("[E]xcessively broad protection would stifle, rather than advance, the [copyright

law's] objective." (quoting Leval, *supra*, at 1109)). With regard to photographs that depict the

facts of historical events, "[t]he more newsworthy the person or event depicted, the greater the

concern that too narrow a view of the fair use defense will deprive the public of significant

information"—especially when "only a finite number of photographers capture images of a given

historical event." *Monster Commc'ns, Inc.*, 935 F. Supp. at 494.

Fair use is now codified at 17 U.S.C. § 107. It provides that "the fair use of a

copyrighted work . . . for purposes such as criticism, *comment*, news reporting, teaching . . . ,

scholarship, or research, is not an infringement of copyright." *Id.* (emphasis added). It then lists

four non-exclusive factors that "shall" be considered when determining whether a use is "fair":

1. the purpose and character of the use, including whether such use is of a
   commercial nature or is for nonprofit educational purposes;
2. the nature of the copyrighted work;
3. the amount and substantiality of the portion used in relation to the copyrighted
   work as a whole; and
4. the effect of the use upon the potential market for or value of the copyrighted
   work.

*Id.* "Although defendants bear the burden of proving that their use was fair, they need not

establish that each of the factors set forth in § 107 weighs in their favor." *Swatch Grp. Mgmt.*

*Servs. Ltd.*, 2014 WL 2219162, *5. The four factors "are to be explored, and the results weighed

together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

**B.    Factor 1: The "Purpose and Character" of Defendants' Use of the Work**
**Was for Commentary and Historical Remembrance, Which Favors a Finding**
**of Fair Use.**

The first factor in the fair use analysis concerns "the purpose and character of the use,

including whether such use is of a commercial nature or is for nonprofit educational purposes."

17 U.S.C. § 107(1). "The central purpose of this investigation is to see . . . whether the new

12

work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579. This factor favors Defendants because (i) the Work was used for "comment," one of the paradigmatic fair uses listed in the preamble of Section 107 (*see infra* subsection 1), (ii) the Work was used for a "transformative" purpose, *i.e.*, a different purpose than that for which it was created (*see infra* subsection 2), and (iii) Defendants' use of the Work was not "commercial" in nature (*see infra* subsection 3).

> (1)  *Defendants used the Work for purposes of "comment," creating a "strong presumption" that the first factor favors Defendants.*

"Comment" is listed in the preamble to Section 107 as a paradigmatic example of a fair use. "There is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107." *NXIVM Corp.*, 364 F.3d at 477 (citation omitted) (use of quotations from executive seminar training manuals in critical analyses of those seminars held to be a fair use); *Hofheinz v. Discovery Commc'ns, Inc.*, 00 CIV. 3802 (HB), 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) (use of film clips in documentary-style program regarding common themes in that genre of film held to be a fair use). "If a [work] falls into one of these categories [*e.g.*, "comment"] . . . assessment of the first fair use factor should be at an end." *Wright*, 953 F.2d at 736 (citation omitted) (use of portions of an author's unpublished letters a fair use when used in the context of a scholarly biography about the author). This is so because, by its very nature, "comment"—like criticism, news reporting, teaching, scholarship, and research—typically results in a work that "serves a new and different function from the original work and is not a substitute for it." *HathiTrust*, 2014 WL 2576342, at *6.

Here, Defendants' use of the Work is comfortably categorized as "comment." To start, the September 11/Iwo Jima Image is itself a comment about the parallels between heroic acts of Americans during World War II and on September 11, 2001. It overtly draws a connection between American resilience—centered on the American flag, a symbol of that resilience—in both 1945 and 2001. (¶¶ 23, 24, 30, 31.) Defendants' use of the September 11/Iwo Jima Image was accompanied by the phrase "neverforget," a common phrase connoting remembrance of tragic episodes in history, including September 11, 2001. Coupled with a hashtag, that phrase signaled Defendants' participation in an ongoing, global discussion concerning the tragic events twelve years prior. (¶¶ 33, 34.) The posting could be "comment[ed] on" by Facebook users who chose to interact with the posting, and the post generated no fewer than 276 comments. (¶ 36.) This is a primary function of social media: It is a two-way street for engaging others, and for others to engage with the person who originally posted the content.

Defendants used the Work to make a "comment" about September 11, 2001; thus, the inquiry under this factor "should be at an end." *Wright*, 953 F.2d at 736. However, should the Court engage in an assessment of the other considerations under the first factor (*see infra* subsections 2 and 3), it should still reach the conclusion that the first factor favors a finding that Defendants' use of the Work, or a derivative of the Work, was fair.

>    (2)    *Defendants' use was "transformative" because it was done for a purpose distinct from the original purpose for which the Work was created.*

Since the Supreme Court's landmark 1994 decision in *Campbell*, the touchstone of the first fair use factor has been an evaluation of whether the use is "transformative." *Bill Graham Archives*, 448 F.3d at 608 (identifying "transformative[ness]" as being "[m]ost important to the court's analysis of the first factor"). "The more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use." *HathiTrust*, 2014

14

WL 2576342, at *6 (quoting *Campbell*, 510 U.S. at 579).

As the Court of Appeals recently held, courts should not play the role of cultural critic to determine whether a defendant's use "add[s] value or utility" to the world; that, simply, "is not the test." *Id.* Rather, "a transformative work is one that serves a new and different function from the original work and is not a substitute for it." *Id.* Stated differently, a use is transformative where a defendant's "purpose in using the copyrighted image[] at issue . . . is plainly different from the original purpose for which [it] w[as] created." *Bill Graham Archives*, 448 F.3d at 609; *see Blanch*, 467 F.3d at 252 (use of photographs was transformative where there were "sharply different objectives that [the defendant] had in using, and [the plaintiff] had in creating," the copyrighted work). In such cases, the defendant's use of the copyrighted work would do "no harm to the legitimate copyright interests of the original author," who would have had the incentive to develop the original work—and thus benefit the public with its creation—regardless of whether the defendant made use of the protected work. *See Swatch Grp. Mgmt. Servs. Ltd.*, 2014 WL 2219162, at *9.

A party does not need to *create* an independently copyrightable work for its use of an original work to be fair. What matters is the transformative *purpose* of the defendant's *use* of the copyrightable elements of the original work. *Id.* at *8 (observing that, "in some instances," it is "desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration," and that the use would still be "transformative" by virtue of its "altered purpose or context of the work, as evidenced by surrounding commentary or criticism"). Several recent cases—including binding precedent from the Court of Appeals—illustrate this point. In *Swatch*, the secondary user disseminated a "full, unaltered sound recording of [the plaintiff's copyrighted] earnings call as part of its paid financial research service." *Id.* at *10. After

recognizing that the defendant's use fell into one of the categories listed in Section 107, the Court held that "a secondary work 'can be transformative in function or purpose without altering or actually adding to the original work.'" *Id.* at *8 (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (holding that making an exact digital copy of a student's thesis for the purpose of determining whether it included plagiarism is a fair use)). In *HathiTrust*, the Court of Appeals confronted a wholesale copying of millions of works, in full, for the purpose of creating a searchable digital database.  Because the original works had not been created for the "purpose of enabling text searches of their books," the Court observed that the defendants had not "merely repackage[d] or republish[ed] the original, or merely recast an original work into a new mode of presentation," and had instead made a "quintessentially transformative use" of the books.  *HathiTrust*, 2014 WL 2576342, at *7; *see also Google Books*, 954 F. Supp. 2d at 291 (Google Books project, which involves development of searchable digital database of millions of books, in full and unaltered, for online searching, held to be a fair use).

 *Bill Graham Archives* is particularly instructive.  That case concerned reduced-sized Grateful Dead concert posters that were used by the defendant in full, with captions describing the concerts they represented in a nonfiction book entitled *Illustrated Trip*.  448 F.3d at 607.  The posters had originally been created for the "dual purposes of artistic expression and promotion" of the concerts; they "convey[ed] information to a large number people about the band's forthcoming concerts."  *Id.* at 609.  The secondary user's purpose, however, was to feature them as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events featured on *Illustrated Trip's* timeline."  *Id.*  The Court concluded that this was a "transformative purpose . . . separate and distinct from the original artistic and promotional purpose for which the images were created."  *Id.* at 610.

Defendants here, as in *Bill Graham Archives*, used a derivative of the Work for a purpose that is distinct from that for which the Work was created.  There is no dispute that the Work was created for the purpose of reporting on the breaking news events of September 11, 2001.  (¶¶ 3, 4, 5, 6, 7, 8.)  Franklin has acknowledged that he was just ███████████████████████ ████████████████████████████████████████████████ ██████████████████████████.  (¶ 6.)  As Franklin has admitted, he did not " ████████████████████████████████████████ " and that " ████████ ████████████████████ "  (¶¶ 9, 10.)  Franklin " ██████████████ ████████████████████████████████ "  (¶ 10.)  In contrast, Defendants' purpose in using the Work was to express solemn remembrance for September 11, 2001 while simultaneously connecting the heroic acts of that day to the heroic acts on Iwo Jima. Defendants' purpose for using the Work was "separate and distinct" from Plaintiff's purpose in creating the Work.  *See Bill Graham Archives*, 448 F.3d at 610.

In fact—and rendering Defendants' use even more transformative than the uses at issue in *Hathitrust*, *Swatch*, and *Bill Graham Archives*—the image Defendants actually used (the September 11/Iwo Jima Image) was *not* the original.  Rather, in furtherance of Defendants' transformative purpose, it was reduced in size, cropped, and combined with *Raising the Flag on Iwo Jima.*  (¶¶ 23, 28, 29, 30, 31.)  Tanner specifically chose the September 11/Iwo Jima Image—and *not* the Work—because the former drew a parallel between two acts of American heroism that prominently featured our country's flag, a powerful symbol of resilience and unity. (¶ 24.)

Although visual alteration is not required to find a transformative use, other cases involving visual alterations—like the alteration to the Work at issue in this case—make clear that

17

visual alterations further a defendant's transformative purpose.  For example, in *Blanch*, an artist used a "fashion photograph created for publication in a glossy American lifestyles magazine . . . as part of a massive painting commissioned for exhibition in a German art-gallery space," changing "its colors, the background against which it is portrayed, the medium, the size of the objects pictured, the objects' details and, crucially, their entirely different purpose and meaning."  467 F.3d at 253.  Because the defendant used the work as "raw material . . . in the furtherance of distinct creative or communicative objectives, the use [was] transformative."  *Id.* Similarly, in *Cariou*, the Court of Appeals reversed a grant of summary judgment to a plaintiff on the issue of fair use and, instead, awarded summary judgment to the defendant with regard to 25 of 30 of the plaintiff's works.[8]  The Court held that the visual alterations to the original work were "transformative" because they had "a different character, [gave the original] photographs a new expression, and employ[ed] new aesthetics with creative and communicative results distinct from" those of the original photographs.  714 F.3d at 708.

Here, the image used by Defendants—the September 11/Iwo Jima Image—is a visual alteration of the original Work that furthered their transformative purpose and message.[9]  For these reasons, Defendants' use of the September 11/Iwo Jima Image was a transformative use of the Work.

(3)     *Defendants' use of the Work, on a Facebook feed, to express*
        *remembrance for September 11 was not a "commercial" use.*

With regard to whether the use was "commercial," the Court of Appeals has "discounted

---

[8] The Court vacated and remanded with regard to five of the works at issue in that case, instructing the District Court to make its own fair use determination in the first instance.  *Cariou*, 714 F.3d at 708.
[9] Plaintiff's counsel admitted, at a pre-motion conference before the Court on June 20, 2014, that "What Fox News did . . . was alter" the Work.  (¶ 32.)  Plaintiff's counsel made this admission notwithstanding that Defendants are accused of copying the Work itself, not creating or copying a derivative of that Work.  (¶ 40.)  *See* 17 U.S.C. § 101 (defining derivative work).

this consideration where the link between the defendant's commercial gain and its copying is . . . attenuated such that it would be misleading to characterize the use as commercial exploitation." *Swatch Grp. Mgmt. Servs. Ltd.*, 2014 WL 2219162, at *7. "The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a *direct consequence* of copying the original work." *Cariou*, 714 F.3d at 708 (emphasis added). Where the alleged infringer does not sell the allegedly infringing work (or items featuring it), it "does not engage in the direct commercialization of [the] copyrighted works." *Google Books*, 954 F. Supp. 2d at 292.

Here, there is no evidence that Defendants have captured *any* revenues—much less "significant revenues"—as a "direct consequence" of posting the September 11/Iwo Jima Image to the Facebook Feed. Although Plaintiff has suggested that the Jeanine Pirro Facebook Page directs viewers to watch *Justice*, persons who receive content posted to the Facebook Feed do not need to—and likely, do not—actually view the page. Instead, they receive the content directly to their own News Feeds, as it is posted, and thus would not see the banner header at the top of the Jeanine Pirro Facebook Page (which, in any event, would have directed prospective viewers to an episode that did not even discuss the topic of the Facebook post in question). (¶ 38.) There is simply no evidence of any connection between the posting of the September 11/Iwo Jima Image to the Facebook Feed, and revenue—certainly, the latter is not a "direct consequence" of the former.

The fact that Fox News is a commercial enterprise is irrelevant. After all, the primary activity in which Fox News engages (via cablecast programming and the internet) is news reporting and commentary, which are uses listed in the preamble to Section 107 as paradigmatic

examples of fair use.  As the Supreme Court has recognized, "Congress could not have intended

a rule that commercial uses are presumptively unfair" when various uses that are "generally

conducted for profit in this country" are listed in the preamble paragraph of Section 107.

*Campbell*, 510 U.S. at 584.  In fact, the Court of Appeals has repeatedly found that the first

factor favored the defendant—and the use was fair—where the defendant sought to make a

profit.  For example, the business news publisher in *Swatch*, the artist in *Cariou*, the book

publisher in *Bill Graham Archives*, and the search engine operator in *Google Books* all operate in

the hopes of making a profit.  And the first fair use factor favored all of them.  As so here—the

first factor favors Defendants.[10]

**C.     Factor 2:  The Factual Nature of Plaintiff's Work Favors a Finding of Fair Use.**

The second factor of the fair use analysis concerns "the nature of the copyrighted work."

17 U.S.C. § 107(2).  "This factor accounts for the fact that some works are closer to the core of

intended copyright protection than others, with the consequence that fair use is more difficult to

establish when the former works are copied."  *Swatch Grp. Mgmt. Servs. Ltd.*, 2014 WL

2219162, at *11 (quoting *Campbell*, 510 U.S. at 586).  Under this factor, the Court should

consider "(1) whether the work is expressive or creative, . . . with a greater leeway being allowed

to a claim of fair use where the work is factual or informational, and (2) whether the work is

---

[10] In pre-motion submissions to this Court, Plaintiff has cited *Sony Corp. of America v. Universal City Studios, Inc.* for the proposition that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." 464 U.S. 417, 451 (1984).  The Supreme Court repudiated this exact language in *Campbell*, reversing the lower court because it had erroneously "elevat[ed] [this] one sentence from *Sony* to a per se rule."  *Campbell*, 510 U.S. at 583-85, 594.  Plaintiff has also cited *Harper & Row Publishers, Inc. v. Nation Enterprises* for the proposition that the commercialism inquiry turns on whether the defendant "stands to profit from exploitation of the copyrighted material without paying the customary price." 471 U.S. 539, 562 (1985).  Plaintiff has not explained *how* Defendants "stand[] to profit" from a Facebook post.  Defendants' expressive use bears no resemblance to the facts in *Harper & Row*, which concerned the surreptitious taking and verbatim publication of President Gerald Ford's unpublished memoirs.

published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou*, 714 F.3d at 709-10 (quoting *Blanch*, 467 F.3d at 256). This factor "may be of limited usefulness where," as here, "the creative work of art is being used for a transformative purpose." *Cariou*, 714 F.3d at 710 (quoting *Bill Graham Archives*, 448 F.3d at 612).

With regard to whether the Work is factual or creative: The Work is factual in nature and not as deserving of copyright protection as a wholly creative work. *Google Books*, 954 F. Supp. 2d at 285 (fact that 93 percent of the copied works were nonfiction favored a finding of fair use). There is no dispute that the photojournalist who took the photograph, Franklin, did so while on assignment to report on the facts unfolding at the site of the World Trade Center on September 11, 2001. (¶¶ 4, 5, 6.) The Work's power comes from those facts: Stunned firefighters, having spent all day witnessing terror at its zenith, had the wherewithal to raise an American flag in an act of defiance and national pride. ██████████████████████—thus leaving few creative decisions over which Plaintiff can claim a copyright. *See Kaplan*, 133 F. Supp. 2d at 323. Plaintiff cannot claim ownership in the firefighters' actions, the expressions on their faces, their ashen uniforms, or the American flag. *See Monster Commc'ns, Inc.*, 935 F. Supp. at 494. This is a factual work, and Plaintiff's copyright is limited to Franklin's creative decisions in taking the photograph. The copyright does not extend to the facts themselves. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 350 (1991) ("[N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.").

Further, there is no dispute that the Work was previously published; thus, the scope of

fair use is broader than it is with unpublished works.  *See Cariou*, 714 F.3d at 709-10.  This

conclusion is all the more appropriate where, as here, the allegedly infringing work

"emphasize[s] the images' historical rather than creative value."  *See Bill Graham Archives*, 448

F.3d at 612-13.  This factor favors Defendants.

### D.   Factor 3:  Defendants' Use of the Key Elements of the Work Favors a Finding of Fair Use, or, at a Minimum, This Factor is Neutral.

The third factor of the fair use analysis concerns "the amount and substantiality of the

portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  This factor

asks whether "the quantity and value of the materials used are reasonable in relation to the

purpose of the copying."  *Swatch Grp. Mgmt. Servs. Ltd.*, 2014 WL 2219162 (2d Cir. May 30,

2014) (quoting *Campbell*, 510 U.S. at 586).  Use of "key portions" of a protected work is

permissible where they are put to a transformative purpose.  In fact, where a defendant has made

a transformative use of the "key" portions of the protected work, the Court of Appeals has held

that the third factor will "weigh[] heavily in [the defendant's] favor."  *Cariou*, 714 F.3d at 710.

At the very least, "courts have concluded that . . . copying [the entire work] does not necessarily

weigh against fair use because copying the entirety of a work is sometimes necessary to make a

fair use of the image."  *Bill Graham Archives*, 448 F.3d at 613; *see HathiTrust*, 2014 WL

2576342, at *8 (copying entire works not excessive where it was "reasonably necessary . . . to

make use of the entirety of the works" for their transformative use; third factor favored

defendant).

Here, Defendants used a cropped version of the Work with imagery added to a large

swath of its right side because that version included only the portion of the Work—the flag and

the persons raising the flag—necessary to communicate their dual messages of remembrance and

the link between the heroic acts of firefighters on September 11, 2001 and the heroic acts of U.S.

Marines during World War II.  An image that focuses more closely on the firefighters raising the flag with less of the Twin Towers' wreckage in the background emphasizes the similarities between the firefighters and the U.S. Marines 56 years earlier.  "[A]s a result" of this transformative use of the Work, "this factor weighs . . . in [Defendants'] favor."  *Id.*  At the very least, the factor does not "necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image," especially where—as here— the Defendants used a smaller, low-quality version of the Work, thereby limiting the Work's overall visual impact.  *Bill Graham Archives*, 448 F.3d at 613 (use of photo in reduced size).

### E. Factor 4:  Defendants' Use Does Not Usurp, or Serve as a Substitute For, Plaintiff's Work, and Thus the Fourth Factor Favors Defendants.

The fourth factor—"the effect of the use upon the potential market for or value of the copyrighted work"—requires an "assess[ment of] the impact of the use on the traditional market for the copyrighted work," *HathiTrust*, 2014 WL 2576342, at *7, or on a "reasonable[] or likely to be developed market[]" for the Work, *Bill Graham Archives*, 448 F.3d at 614-15.  "To defeat a claim of fair use, the copyright holder must point to market harm that results because the secondary use serves as a substitute for the original work."  *HathiTrust*, 2014 WL 2576342, at *7; *see Hofheinz*, 146 F. Supp. 2d at 449 ("The proper question is whether the [defendant's] biography was, in effect, a substitute for [the plaintiff's work].")  Stated differently, the copyright holder must show that "the secondary use usurps the market of the original work." *NXIVM Corp.*, 364 F.3d at 482; *Blanch,* 467 F.3d at 258 ("[O]ur concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use *usurps* the market of the original work.").

Here, Plaintiff produced no evidence that it lost a single dollar of licensing revenue due to Defendants' use, or that Defendants have ever once attempted to oust Plaintiff from its licensing

market, let alone that Defendants have usurped that market. Plaintiff cannot defeat summary judgment based on speculation or conjecture; rather, it must come forward with admissible evidence. Fed. R. Civ. P. 56(c)(4); *Opals on Ice Lingerie*, 320 F.3d at 370 (assertions that are conclusory or based on speculation not admissible). Here, there is no admissible evidence that Defendants' use "usurp[ed] the market of the original work." *NXIVM Corp.*, 364 F.3d at 482. Most tellingly, in the wake of Defendants' posting of the September 11/Iwo Jima Image, █████



(¶ 41.)[11]  *See Wade Williams Distribution, Inc. v. Am. Broad. Co., Inc.*, 00-cv-5002(LMM), 2005 WL 774275 (S.D.N.Y. Apr. 5, 2005) ("no evidence that [the defendant's] use of plaintiff's films affected the films' market" where plaintiff continued to license the work after alleged infringement; summary judgment granted to defendant).

     Moreover, Plaintiff has ██████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████. (¶ 47.) ████████

██████████████████████████ (¶ 47.) The fact that Plaintiff has ████████████ reinforces that it does not fear that unpaid usages of the Work would have the effect of usurping Plaintiff's market for it.

     In the same vein, Plaintiff is aware of widespread unlicensed uses of its Work, but does

---

[11] On June 27, 2014, Defendants' counsel reminded Plaintiff's counsel of Plaintiff's continuing obligation to produce documents pertaining to licensing agreements. Plaintiff has not produced any such documents since June 3, 2014—including documents evidencing gratis (*i.e.*, no fee requested) licenses that Plaintiff stated, in its June 3, 2014 interrogatory responses, it would "conduct a reasonable search for" and "produce[]." (¶ 49.)

little to stop it.  (¶ 42.)  ████████████████████████████████████

████████████████████████████████████████████████████████████

(¶¶ 43, 44, 45.)  And Plaintiff's recent push to reboot enforcement of its alleged copyright has

left much to be desired.  On September 11, 2013, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.  (¶ 42.)  Indeed, the September 11/Iwo Jima Image

itself features the legend "concordville.org" at the bottom of the image, yet there is no evidence

that Plaintiff has contacted the Concordville Fire & Protective Association.  (¶¶ 26, 27, 46.)

Moreover, Plaintiff does not seek to protect its rights by ████████████████████

████████████████████████  (¶ 48.)  Plaintiff's newfound and porous (or selective)

enforcement of its copyright in the Work implies that stray internet uses, like the type engaged in

by Defendants here, are not "substitutes," and have not "usurped" the market, for Plaintiff's

Work.  *Blanch*, 467 F.3d at 258 ("[O]ur concern is . . . whether the secondary use usurps the

market of the original work.").

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that their use of the Work was

fair, 17 U.S.C. § 107, and request that the Court grant Defendants' Motion.

Dated: New York, New York          HOGAN LOVELLS US LLP
      June 30, 2014

              By: _____
                Dori Ann Hanswirth
                  dori.hanswirth@hoganlovells.com
                Nathaniel S. Boyer
                  nathaniel.boyer@hoganlovells.com
                Benjamin A. Fleming
                  benjamin.fleming@hoganlovells.com
                875 Third Avenue
                New York, New York 10022
                tel: (212) 918-3000
                *Attorneys for Defendants*