UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
NORTH JERSEY MEDIA GROUP INC.,                          :
                                                        :
                             Plaintiff,                 :
                                                        :        **AMENDED
          - against -                                   :     OPINION AND ORDER**
                                                        :        13 Civ. 7153 (ER)
JEANINE PIRRO and FOX NEWS NETWORK, LLC,                :
                                                        :
                             Defendants.                :
----------------------------------------------------------------------x

Ramos, D.J.:

      Plaintiff North Jersey Media Group Inc. ("Plaintiff" or "NJMG") brings this action

against Jeanine Pirro and Fox News Network, LLC ("Fox News") (collectively, "Defendants")

under the Copyright Act, 17 U.S.C. § 101, alleging that Defendants infringed on Plaintiff's

copyright in its now iconic photograph of three firefighters raising the American flag at the ruins

of the World Trade Center site on September 11, 2001 (the "Work").  Fox News posted a

photograph that juxtaposed the Work with the classic World War II photograph of four U.S.

Marines raising the American flag on Iwo Jima[1] (the "Combined Image") on a Facebook page

associated with Fox News' television program *Justice with Judge Jeanine*.  Defendants contend

that their posting of the Combined Image was protected "fair use" under the Copyright Act.  *See*

17 U.S.C. § 107.  Pending before the Court is Defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56.  (Doc. 31)  For the reasons set forth below, Defendants' motion

for summary judgment is DENIED.

## I.    Factual Background

      The following facts are undisputed except where otherwise noted.

---

[1] This photograph, taken by Joe Rosenthal, is entitled *Raising the Flag on Iwo Jima*.

a. **The Work**

Plaintiff is the publisher of New Jersey-based newspapers *The Record* (Bergen County) and *Herald News*.  Pl.'s 56.1 Counter-Stmt. ¶ 1.[2]  Thomas E. Franklin is a photojournalist who works for NJMG.  Defs.' 56.1 Stmt. ¶ 3.  On September 11, 2001, Franklin was assigned to cover the attacks on the World Trade Center.  Pl.'s 56.1 Counter-Stmt. ¶ 4.  Among the many photographs Franklin took that day was a photograph of three firefighters raising an American flag near the ruins of the World Trade Center.  *Id.* ¶ 5.  The Work was first published on page A32 of the September 12, 2001 edition of *The Record*.  Pl.'s 56.1 Stmt. ¶ 7.

Franklin disclaims that in the immediacy of the moment he recognized the symbolic importance the Work would ultimately achieve.  For example, on September 20, 2001, Plaintiff stated on one of its websites that Franklin did not "kn[o]w initially that [his] . . . instincts would grow into a national symbol of patriotism."  Defs.' 56.1 Stmt. ¶ 9.  Similarly, a year later, in a September 11, 2002 article posted on Plaintiff's website, *northjersey.com*, Franklin stated:

> [The] photo just happened, in a brief moment.  I recognized it, shot it the best I could, and moved on, continuing to shoot the devastation.  I did note the similarity to Joe Rosenthal's World War II photograph of the Iwo Jima flag-raising and was certainly aware of the symbolism of what these firefighters were doing, but in no way did I have time to analyze it.  The events of the day were far more important, and in my mind, always will be.

Pl.'s 56.1 Counter-Stmt. ¶ 10.  The parties do not dispute, however, that Plaintiff knew—at the latest—shortly after the time of original publication that the Work had historical importance.

---

[2] Citations to "Pl.'s 56.1 Counter-Stmt." refer to Plaintiff's Counter-Statement of Material Facts pursuant to Local Civil Rule 56.1, Doc. 56.  Citations to "Defs.' 56.1 Stmt." refer to Defendants' Statement of Material Facts pursuant to Local Civil Rule 56.1, Doc. 34.  Citations to "Pl.'s 56.1 Stmt." refer to Plaintiff's Statement of Material Facts pursuant to Local Civil Rule 56.1, Doc. 56.  Citations to "Defs.' 56.1 Counter-Stmt." Refer to Defendants' Statement of Material Facts in Response to Plaintiff's Statement pursuant to Local Civil Rule 56.1, Doc. 65.

Defs.' 56.1 Counter-Stmt. ¶¶ 10, 15.  Franklin has received numerous awards for the Work.  Pl.'s 56.1 Stmt. ¶ 13.

Less than one month after the photograph was taken, on October 5, 2001, Jennifer Borg, NJMG's Vice President, General Counsel and Corporate Secretary, registered the Work with the U.S. Copyright Office.  *Id.* ¶ 16.  This was the first time Plaintiff had ever registered a copyright in an individual photograph with the Copyright Office.  *Id.*

### b.  Fox News' Use of the Combined Image

Defendant Pirro hosts *Justice with Judge Jeanine* (the "Program"), a news and commentary program that airs on the Fox News Channel.  Pl.'s 56.1 Counter-Stmt. ¶ 12.  Fox News also manages a Facebook page that is associated with the Program (the "Pirro Facebook Page").  *Id.* ¶ 13.  Fox News created the Pirro Facebook Page at least in part to promote the Program.  *See*  Defs.' 56.1 Counter-Stmt. ¶ 2.

According to Defendants, Georeen Tanner, a Fox News production assistant assigned to the Program, is also principally responsible for managing and posting content to the Pirro Facebook Page.  Defs.' 56.1 Stmt. ¶ 13.  As of September 11, 2013, Tanner had been working at Fox News as a production assistant for the Program for approximately three years.  *See* Declaration of Georeen Tanner ("Tanner Decl.") ¶ 4.  She joined the Program upon graduating from Rutgers where she majored in journalism and media studies.  *Id.* ¶ 2.  While she has received no training in copyright law either in college or during her tenure at Fox News, she acknowledged in her deposition that she understood a copyright to be "[s]omething that is owned by someone else."  Tanner Tr. 71:10.  Tanner further testified that she had sought legal advice from Fox News' legal department regarding the fair use of photographs and videos on the Program a few times a month.  *Id.* 72:22-23, 70:20-24.  However, she had never consulted the

legal department in connection with the posting of images to the Pirro Facebook Page.  *Id.* 74:17, 69:17-23.

Tanner found the Combined Image on September 11, 2013, when she Googled "9/11" in order to find an image to post on the Pirro Facebook Page to commemorate the events of September 11, 2001.  Defs.' 56.1 Stmt. ¶¶ 19, 20; *see* Tanner Decl. ¶ 10.[3]  Defendants claim that Tanner had not previously seen the Combined Image, but that she immediately recognized the juxtaposition of the Work and *Raising the Flag on Iwo Jima*.  Defs.' 56.1 Stmt. ¶ 23.  According to Defendants, Tanner chose to use the Combined Image precisely because of the parallel drawn between the first responders and the Marines.  *Id.* ¶ 24.  Tanner posted the Combined Image to the Pirro Facebook Page that day.  Pl.'s 56.1 Counter-Stmt. ¶ 28.  The decision to post the Combined Image was hers, and she did not seek the advice of the legal department or anyone else associated with the Program before doing so.  *Id.*

Tanner did not alter the Combined Image other than to add the phrase "#neverforget."[4]  Defs.' 56.1 Stmt. ¶ 33.  Tanner stated in her declaration that she posted the Combined Image to convey Fox News' participation in the global conversation taking place on social media that day.  *Id.* ¶ 37.  According to Defendants, hundreds of people commented on Fox News' posting of the Combined Image on Facebook.  *Id.* ¶ 36.

The Combined Image does not include the entirety of the Work.  Pl.'s 56.1 Counter-Stmt. ¶ 31.  Portions of the top and the right-hand side of the Work do not appear in the Combined

---

[3] Plaintiff disputes Tanner's purported intentions based on Tanner's deposition testimony that (i) she is paid by Fox News to update the Pirro Facebook Page in order to engage the page's followers, and (ii) one of the purposes of the Pirro Facebook Page is to promote the Program.  Pl.'s 56.1 Counter-Stmt. ¶¶ 19-20; *see* Tanner Tr. 54:8-10, 55:15-21.

[4] On September 11, 2013, "#neverforget" was a popular hashtag that Tanner saw many times on social media.  Pl.'s 56.1 Counter-Stmt. ¶ 34.

Image.  *Id.*  As a result, the firefighters occupy a larger portion of the Combined Image than they do in the Work.  *Id.*  The Combined Image also differs from the Work in that the resolution is lower and the scale is smaller.  Defs.' 56.1 Stmt. ¶ 29; Pl.'s 56.1 Counter-Stmt. ¶ 29.

According to Defendants, the Combined Image found on Google did not contain any restrictions on copying.  Defs.' 56.1 Stmt. ¶ 25.[5]  Defendants contend that Tanner did not seek permission from anyone to use the Combined Image because she did not believe—and still does not believe—that she needed permission to use the image for the purpose of making a commentary in remembrance of the events of September 11, 2001.  *Id.* ¶ 35.

The events of September 11, 2001 were not discussed on the editions of the Program that aired on the Saturdays immediately preceding and following the posting,[6] nor did the posting contain any information about the contents of the upcoming edition of the Program.  Pl.'s 56.1 Counter-Stmt. ¶ 38.  While Defendants claim that the posting did not contain any information as to when the next episode of the Program would be televised, Defs.' 56.1 Stmt. ¶ 38, Plaintiff asserts that a banner appearing across the top of the Pirro Facebook Page did, in fact, provide such information to users.  Pl.'s 56.1 Counter-Stmt. ¶ 38.[7]

---

[5] Plaintiff disputes Defendants' claim that the Combined Image did not contain any restrictions on copying based on the fact that the legend "concordville.org" appeared at the bottom right-hand corner of the image found by Tanner. Pl.'s 56.1 Counter-Stmt. ¶ 26.  This legend refers to the website of the Concordville Fire & Protective Association, a volunteer firefighting organization in Concordville, Pennsylvania.  *Id.* ¶ 27.

[6] Facebook users who have "liked" the Pirro Facebook Page automatically receive content posted to the page on their personal "News Feeds," which are constantly updating lists of stories from people and Facebook pages that the users follow.  Pl.'s 56.1 Counter-Stmt. ¶ 14.  Facebook users can read, like, comment on, or share such postings through their own News Feeds, without connecting to the Pirro Facebook Page itself.  *Id.* ¶ 16.  Defendants claim that the primary way Facebook users view content posted to the Pirro Facebook Page is by receiving the content on their News Feeds.  Defs.' 56.1 Stmt. ¶ 15.

[7] According to Plaintiff, the banner advertises that the Program airs on Saturdays at 9 p.m.  *See* Declaration of William Dunnegan In Opposition to Defendants' Motion for Summary Judgment, Ex. G.  Defendants do not appear to contest this, but explain that Facebook users who saw Tanner's posting on their News Feeds (*i.e.*, without visiting the Pirro Facebook Page) would not have seen this banner.  *See* Defs. Reply Mem. L. 7.

On September 13, 2013, after learning that an attorney had contacted Defendant Pirro to request that Fox News remove the Combined Image from the Pirro Facebook Page, Defendants deleted the posting.  Defs.' 56.1 Stmt. ¶ 39.

### c.  Licensing and Other Uses of the Work

Almost immediately after publication of the Work, Plaintiff was "inundated" with requests to license the photograph.  Pl.'s 56.1 Stmt. ¶ 17.  To date, NJMG has raised more than $1 million in licensing revenue from the Work.  *Id.* ¶ 20.  This licensing reached its peak in the period 2002 to 2004, but has continued over time.  *Id.*  NJMG has licensed the Work for a fee to several media outlets, including television and print media.  *See* Declaration of Dori Ann Hanswirth ("Hanswirth Decl."), Ex. O.  Plaintiff's gross revenue for editorial licensing from January 1, 2013 through June 3, 2014 was $10,221.71, whereas its gross revenue for commercial licensing during the same period was $4,698.91.  Defs.' 56.1 Counter-Stmt. ¶ 19; *see* Hanswirth Decl., Ex. S.

Plaintiff has also licensed the Work for use to a number of entities at no cost.  Pl.'s 56.1 Counter-Stmt. ¶ 47.  Since Fox News' posting of the Combined Image on September 11, 2013, Plaintiff has licensed the Work through Getty and the Associated Press at least 14 times.  *Id.* ¶ 41.  While Plaintiff occasionally sent cease and desist letters in connection with infringing uses of the Work,[8] *see id.* ¶ 43; Declaration of Jennifer A. Borg In Opposition to Defendants' Motion for Summary Judgment ¶¶ 11-12, NJMG did not file any lawsuits concerning the alleged

---

[8] Relatedly, there is no evidence that Plaintiff ever contacted the Concordville Fire & Protection Association in connection with the Combined Image.  Defs. Mem. L. 25; *see* Pl.'s 56.1 Counter-Stmt. ¶ 46.

infringement of its copyright in the Work until December 6, 2012.  Pl.'s 56.1 Counter-Stmt. ¶ 45.[9]

There is no dispute that Plaintiff may have granted a license to Fox News for the use of the Combined Image if Fox News had made such a request before Tanner posted the image to the Pirro Facebook Page.  Pl.'s 56.1 Stmt. ¶ 23.

## II.  Procedural Background

Plaintiff commenced this action on October 9, 2013, by filing a Complaint against Defendant Pirro.  Doc. 1.  On February 20, 2014, Plaintiff filed the Amended Complaint, adding Fox News as a defendant.  Doc. 12.  A pre-motion conference was held on May 30, 2014, and the instant motion was filed on June 30, 2014.  *See* Doc. 31.

## III. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the

---

[9] The parties dispute the extent to which Plaintiff has sought to enforce its copyright over the years.  According to Defendants, Plaintiff is aware of at least 11 other uses of the Work on September 11, 2013 that it considered to be infringing.  Defs.' 56.1 Stmt. ¶ 42.  Plaintiff did not contact seven of the businesses responsible for such uses, however.  Pl.'s 56.1 Counter-Stmt. ¶ 42.  Defendants also claim that Plaintiff did not issue any cease and desist letters concerning alleged infringements of its copyright in the Work between March 14, 2003 and February 7, 2012.  Defs.' 56.1 Stmt. ¶ 43.  As discussed above, however, Plaintiff contests this claim.

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).   The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

## IV. Discussion

Plaintiff has brought this action under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* The purpose of the copyright law is "[t]o promote the Progress of Science and useful Arts . . . ." U.S. Const., Art. I, § 8, cl. 8.  "[T]he copyright is not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations.  It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public."  Pierre N. Leval,

*Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990) ("Leval"); *see Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 618 (2013).  The Copyright Act furthers this purpose by granting authors a limited monopoly over the dissemination of their original works of authorship.  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014). In particular, the Copyright Act confers upon authors certain enumerated exclusive rights over their works during the term of the copyright, including the rights to reproduce the copyrighted work and to distribute those copies to the public.  *Id.* (citing 17 U.S.C. § 106(1), (3)).

At the same time, there are important limits to an author's rights to control original and derivative works.  *Id.* at 95.  "One such limit is the doctrine of 'fair use,' which allows the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances."  *Id.*  The fair use doctrine mediates between the "property rights [copyright law] establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them—or ourselves by reference to the works of others, which must be protected up to a point."  *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006).

The fair use doctrine was codified in the Copyright Act of 1976, which lists four non-exclusive factors that must be considered in determining fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

9

17 U.S.C. § 107.  Although Defendants bear the burden of proving that their use was fair, they

need not establish that each of the factors set forth in Section 107 weighs in their favor.  *Swatch*

*Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014) (quoting *NXIVM Corp.*

*v. Ross Inst.*, 364 F.3d 471, 476-77 (2d Cir. 2004), *cert. denied*, 543 U.S. 1000 (2004)).  Instead,

the factors "are to be explored, and the results weighed together, in light of the purposes of

copyright."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).[10]  Moreover, as will

be seen below, certain considerations will be relevant with respect to more than one factor.

     Although fair use is a mixed question of law and fact, courts in the Second Circuit have

"on a number of occasions" resolved fair use determinations at the summary judgment stage

where there are no genuine issues of material fact.  *Castle Rock Entm't, Inc. v. Carol Publ'g*

*Grp.*, 150 F.3d 132, 137 (2d Cir. 1998).

### a.  Factor One:  The Purpose and Character of the Use

     The first factor, which addresses the manner in which the copied work is used, is the

"heart of the fair use inquiry."  *Blanch*, 467 F.3d at 251.  As the Supreme Court instructed in

*Campbell*, the central purpose of the inquiry is to see whether the new work merely supersedes

the objects of the original creation, or instead adds something new, with a further purpose or

different character, altering the first with new expression, meaning, or message.  510 U.S. at 579

(quoting *Folsom v. Marsh*, 9 F.Cas., 342, 348 (no. 4,901) (C.C.D. Mass. 1841)).  In other words,

the investigation "asks . . . whether and to what extent the new work is 'transformative.'"  *Id.*

(quoting Leval at 1111).  "A use is transformative if it does something more than repackage or

republish the original copyrighted work."  *HathiTrust*, 755 F.3d at 96.

---

[10] As the Supreme Court stated in *Campbell*, the fair use inquiry may be guided by the examples set forth in the
preamble to Section 107, such as whether the purpose of the use was for "criticism, comment, news reporting,
teaching . . . , scholarship, or research."  510 U.S. at 578-79; *see* 17 U.S.C. § 107.

"Although transformative use is not 'absolutely necessary' to a finding of fair use, 'the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.'" *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 290-91 (S.D.N.Y. 2013) (quoting *Campbell*, 510 U.S. at 579). Indeed, if "'the secondary use adds value to the original—if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.'" *Castle Rock*, 150 F.3d at 142 (quoting Leval at 1111). "Added value or utility is not the test: a transformative work is one that serves a new and different function from the original work and is not a substitute for it." *HathiTrust*, 755 F.3d at 96. And as the Court stated in *Campell*, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." 510 U.S. at 579.

### 1) *Transformative Use*

Defendants argue that the first factor favors a finding of fair use because the connection drawn between the events of September 11, 2001 and Iwo Jima can be "comfortably categorized as 'comment.'" Defs. Mem. L. 14. According to Defendants, Tanner's use of the phrase "#neverforget" connoted remembrance of, and signaled Fox News' participation in an ongoing, global discussion concerning, the events of September 11, 2001. *Id.* Defendants further claim that they used a derivative of the Work for a distinct purpose: whereas Franklin's purpose in creating the Work was to report the news of the day, Fox News' use was designed to express solemn remembrance for September 11, 2001 and link the heroic acts of that day and World War II. *Id.* at 17. Plaintiff, on the other hand, claims that Fox News did not create any new content,

11

use existing content for a materially different purpose, or disseminate existing content to a new audience that might not have seen it otherwise.  Pl. Opp. Mem. L. 13.  NJMG further contends that Fox News used the Combined Image not for commentary, but rather for a commercial purpose:  to advertise and promote the Program.  Pl.'s 56.1 Counter-Stmt. ¶ 24.

To be sure, Defendants did not simply copy the Work wholesale.  The image used by Defendants was different from the Work in five distinct ways.  Fox News used a (1) cropped, (2) lower-resolution version of the Work, (3) which was juxtaposed with *Raising the Flag on Iwo Jima* and (4) in a smaller scale than the Work, and (5) added the phrase "#neverforget."

Despite Defendants' claims regarding their use of the Work, however, the Court cannot conclude as a matter of law that the Combined Image transformed the Work sufficiently to merit protection as fair use.  As Plaintiff asserts—accurately in the Court's view—the alterations to the Work are "barely discernable" unless the viewer is specifically prompted to look for them.  Pl. Opp. Mem. L. 13-14.  The Work is the clearly predominant feature of the Combined Image. Thus, a casual observer may believe that he is simply viewing the Work with only the hashtag added.  Second Circuit authority suggests that more is required to "transform" an image.  In *Cariou*, for example, the Second Circuit considered appropriation artist Richard Prince's alterations of copyrighted photographs that professional photographer Patrick Cariou took during the course of a period spent living among Rastafarians in Jamaica.  714 F.3d at 698.  At issue in *Cariou* were thirty works of art Prince created through the appropriation of partial or whole images from Cariou's book *Yes Rasta*.  *Id.* at 699.  The portions of the *Yes Rasta* photographs used, and the amount of the artwork that they constituted, varied significantly from piece to piece.  *Id.* at 699-700.  Prince also changed other features of Cariou's work, including the scale and medium.  Whereas *Yes Rasta* is a book of photographs measuring approximately 9.5" x 12",

12

Prince's works, in addition to the images appropriated from the book, comprise inkjet printing and acrylic paint, as well as pasted-on elements, and are several times that size.  *Id.* at 700.

The Second Circuit found twenty-five of the thirty Prince works to be transformative as a matter of law.  *Id.* at 706.  In those pieces, Prince's composition, presentation, scale, color palette, and media were "fundamentally different and new" compared to the Cariou photographs. *Id.*  The court noted that those portions of Cariou's photographs as to which it found fair use were heavily obscured and altered to the point that the original works were "barely recognizable."  *Id.* at 710.  Accordingly, the Second Circuit was able to conclude by looking at the Prince artworks and the Cariou photographs side-by-side that those twenty-five works had a different character, gave Cariou's photographs a new expression, and employed new aesthetics with creative and communicative results distinct from Cariou's.  *Id.* at 707-08.

However, the court could not conclude that the remaining five works were sufficiently transformative as a matter of law despite noting that there were key differences in those works compared to the Cariou photographs.  *Id.* at 710, 711.[11]  In *Graduation*, for example, Prince tinted a black-and-white photograph blue, painted a diamond-like shape over the subject's eyes and mouth, pasted enlarged hands and an electric guitar onto the canvas, and placed the image onto a large canvas.  *Id.* at 700, 711.  Despite these significant alterations, the Second Circuit was unable to conclude that the use of the Cariou photograph in *Graduation* was fair use as a matter of law.  That conclusion, while not determinative, is instructive here because the Work is barely altered and is immediately recognizable as the iconic 9/11 photograph.  Certainly, the level of

---

[11] The Second Circuit vacated and remanded with regard to the five remaining artworks, instructing the district court to make its own fair use determination in the first instance.  *Cariou*, 714 F.3d at 712.  The parties entered into a stipulation of voluntary dismissal before the district court ruled on the issue.

alteration here would appear to be much less even than the five works as to which the Second Circuit remanded in *Cariou*.

Similarly, in *Blanch*, the Second Circuit affirmed the district court's ruling on summary judgment that artist Jeff Koons' appropriation of fashion photographer Andrea Blanch's photograph *Silk Sandals by Gucci* was fair use.  467 F.3d at 246.  *Silk Sandals by Gucci* appeared in the August 2000 issue of *Allure* magazine.  *Id.* at 247-48.  It depicts a woman's lower legs and feet, shod in Gucci sandals, resting on a man's lap in an airplane cabin.  *Id.* at 248.  At issue in *Blanch* was Koons' painting *Niagara*, which depicts four pairs of women's feet and lower legs dangling prominently over images of desserts and pastries with a grassy field and Niagara Falls in the background.  *Id.* at 247.  Similar to the artistic process employed by Prince, Koons took from the photograph only the image of the woman's legs and feet, cropping the background of the airplane cabin and the man's lap, before adding the resulting image into *Niagara*.  *Id.* at 248.  And unlike in this case, the parties did not dispute that Koons' purposes in using the photograph were "sharply different" from Blanch's goals in creating it.  *Id.* at 252.

The Second Circuit concluded that Koons' use of the Blanch photograph was transformative because of the new expression, meaning, and message captured in *Niagara*.  *Id.* at 253.  The court observed:

> The [fair use] test almost perfectly describes Koons's adaptation of "Silk Sandals":  the use of a fashion photograph created for publication in a glossy American "lifestyles" magazine—with changes of its colors, the background against which it is portrayed, the medium, the size of the objects pictured, the objects' details and, crucially, their entirely different purpose and meaning—as part of a massive painting commissioned for exhibition in a German art-gallery space.

*Id.*

14

Defendants' use of the Combined Image presents a much closer call.  The Combined Image used by Fox News surely altered the content and message of the Work, but only minimally.  Certainly, the alterations do not begin to approach the alterations found to be transformative as a matter of law in *Cariou* and *Blanch*.  It therefore cannot be said that Fox News presented an "entirely different aesthetic" from the Franklin photograph.  *Cf. Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173, 1176 (9th Cir. 2012) (concluding that gossip magazine's publication of copyrighted photographs of celebrity plaintiffs' wedding as an exposé "sprinkled with written commentary" was "at best minimally transformative"; the court noted that the gossip magazine could not "simply take fair use refuge under the umbrella of news reporting").

Wholly apart from the image itself, there is also an issue as to whether the commentary Fox News wished to convey created anything new at all, much less anything transformative.  On the particular facts of this case—as it involves the secondary use of a secondary use[12]—it can be argued that no part of the Combined Image constitutes an original idea on the part of Defendants; some other person first thought to combine the two photographs, and the phrase "#neverforget" was a ubiquitous presence on social media that day.  Thus Fox News' commentary, if such it was, merely amounted to exclaiming "Me too."  Analyzed from that perspective, the posting does not begin to constitute the creation of "new information, new aesthetics, new insights and understandings" required for finding a transformative purpose.  *Castle Rock*, 150 F.3d at 142 (quoting Leval at 1111) (internal quotation marks omitted).  Fox News' use was not therefore the type of activity that the fair use doctrine intended to protect "'for the enrichment of society.'"  *Id.*

---

[12] The parties did not address the issue from this perspective and the Court has not found a case addressing similar facts.

(quoting Leval at 1111); *cf. Monge*, 688 F.3d at 1176 (noting that even if an infringer's purpose was distinct from that of the plaintiff's, such purpose, by itself, does not necessarily create new aesthetics or a new work that alters the original work with new expression, meaning, or message).[13]

### 2) *Commercial Use*[14]

As part of the first factor, the Court must also consider whether, and to what extent, Defendants' use was for a commercial purpose.  This consideration arises when a secondary user makes unauthorized use of copyrighted material to gain a profit through copying the original work.  *Arrow Prods., LTD. v. Weinstein Co.*, --- F. Supp. 2d ----, No. 13 Civ. 5488, 2014 WL 4211350, at *8 (S.D.N.Y. Aug. 25, 2014).  However, the mere fact that Fox News operates a for-profit news service, and that the Pirro Facebook Page is intended to capture revenues for the network, is insufficient for a finding in Plaintiff's favor.  The Second Circuit has consistently recognized that "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983), and has "discounted this consideration where 'the link between [the

---

[13] Even if it were the case, as Defendants claim, that Tanner did not seek permission to use the Combined Image because she did not believe she needed permission for the purpose of making a commentary, her *belief* is entitled to little weight.  *See* Defs.' 56.1 Stmt. ¶ 35.  In the first instance, Tanner has no training in copyright law.  Secondly, whether Defendants appropriated the Work in good faith is irrelevant to the analysis.  *Cf. Monge*, 688 F.3d at 1170 ("Despite its claim that it purchased the photos in good faith, 'the innocent intent of the defendant constitutes no defense to liability'" (quoting 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.08[B][1] (2001)).

[14] Defendants contend that they used the Work to make a comment about September 11, 2001, and that the inquiry under the first factor therefore "should be at an end."  Defs. Mem. L. 14 (quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991)).  However, even assuming the post was designed as commentary, the Court would still analyze the commercial nature of the use.  *See, e.g.*, *NXIVM*, 364 F.3d at 477-79 (discussing the commercial purpose of the use despite the court's conclusion that the defendants' use was transformative as criticism); *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1374 (2d Cir. 1993) (analyzing the commercial nature of the use despite finding that the defendants' use was "surely a work of 'comment'").

defendant's commercial gain and its copying is . . . attenuated' such that it would be misleading

to characterize the use as 'commercial exploitation.'"  *Swatch*, 756 F.3d at 83 (quoting *Am.*

*Geophysical Union*, 60 F.3d at 922); *see also Cariou*, 714 F.3d at 708 (instructing that the first

factor "must be applied with caution because, as the Supreme Court has recognized, Congress

'could not have intended' a rule that commercial uses are presumptively unfair" (quoting

*Campbell*, 510 U.S. at 584)).

Rather, the relative importance of this factor is determined on a sliding scale:  the more

transformative the work, the less important the commercial purpose.  Because, as discussed in

the previous section, neither the image nor the message conveyed by the Combined Image was

substantially transformative, "the question whether the new use is commercial thus acquires an

importance it [would] not [otherwise] have . . . ."  *Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d

Cir. 2001); *cf. United States v. Am. Soc'y of Composers, Authors & Publishers*, 599 F. Supp. 2d

415, 429 (S.D.N.Y. 2009) ("[A]pplicant's use of previews is not transformative, and, thus, the

significance of its commercial use is not reduced, but instead takes on greater importance.").

Defendants contend that their use of the Work was not "commercial," in particular

because there is no evidence that Fox News captured any revenues as a direct consequence of its

use. Defs. Mem. L. 19.[15]  Plaintiff argues that Fox News' use of the Work constituted

advertising and was therefore commercial.  Pl. Opp. Mem. L. 8.  In support of this contention,

NJMG references the banner posted across the top of the Pirro Facebook Page, as well as the fact

that the page invited users to respond to the Program's in-show polls, alerted them about

upcoming guests, and attached videos from episodes of the Program.  *Id.*

---

[15] *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (stating that the commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work).

While Tanner asserts that she posted the Combined Image to convey Fox News'
participation in a global conversation about 9/11, she plainly stated in her deposition that the
purpose of her role with respect to the Pirro Facebook Page is to engage the page's followers,
and that Fox News operates the page, *inter alia*, to promote the Program.  There exists, then, at
least a question of material fact as to whether Fox News posted the Combined Image for the
purely expressive purpose of commenting on the events of September 11, 2001, or whether it did
so for the commercial purpose of promoting the Program.  *See* Pl. Opp. Mem. L. 11.[16]  Given the
relative importance of this factor on the facts of this case, the Court is unable to conclude that it
weighs in favor of either party as a matter of law.[17]

### b.  Factor Two:  The Nature of the Work

The second statutory factor "calls for recognition that some works are closer to the core
of intended copyright protection than others, with the consequence that fair use is more difficult
to establish when the former works are copied."  *Campbell*, 510 U.S. at 586.  Courts have
generally adopted two types of distinctions in their analysis of the second factor:  (1) whether the
work is expressive or creative, such as a work of fiction, or more factual with a greater leeway

---

[16] The Court notes, moreover, that the two purposes are not mutually exclusive.  By "commenting" that we should
not forget the terrible events of 9/11 and honor the nation's response to them, Fox News was also consciously
associating itself with a view indisputably regarded favorably by most if not all of its target audience.  Such
uncontroversial commentary arguably generates goodwill for, and therefore serves to promote, the Program.

[17] Defendants' reliance on *Bill Graham Archives* is misplaced.  There, the court affirmed the district court's grant of
summary judgment for defendant publishers of *Grateful Dead: The Illustrated Trip*, a 480-page coffee table book
that provides a history of the Grateful Dead through the use of a timeline and over 2000 images.  The plaintiff
claimed to own the copyright to seven such images, which the defendants reproduced without permission.  *Id.* at
607.

The Second Circuit found that the first factor weighed in the defendants' favor, *inter alia*, because their purpose in
using the copyrighted images—as historical artifacts to document the Grateful Dead concert events featured in the
book's timeline—was plainly different from the plaintiff's dual purposes of artistic expression and promotion:  the
images were originally used as concert posters to generate public interest in the band's upcoming events.  *Id.* at 609.
This case is different because it presents an issue of fact as to Fox News' purpose in using the work.

being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower. *Blanch*, 467 F.3d at 257 (quoting 2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)); *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 540 (1985) ("The unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use."). In the end, however, this factor is rarely found to be determinative. *Arrow Prods.*, 2014 WL 4211350, at *9 (citing *Davis*, 246 F.3d at 175).

Defendants argue that both prongs favor a determination of fair use. First they argue that the Work is factual in nature and not the product of a wholly creative process. Defs. Mem. L. 21. Instead, Defendants claim that Plaintiff's copyright interest in the Work is limited to Franklin's creative decisions in taking the photograph: "Plaintiff cannot claim ownership in the firefighters' actions, the expressions on their faces, their ashen uniforms, or the American flag." *Id.* Defendants further contend that the previous publication of the Work favors a finding of fair use. *Id.* at 21-22.

According to Plaintiff, the nature of the Work weighs against fair use because it is a "stunning [example] of photojournalism, taken under life threatening conditions, during one of the most significant events in recent American history." Pl. Opp. Mem. L. 19. Plaintiff claims the Work involved many creative decisions, including the orientation of the photograph and the selection of a specific lens to best capture the steel wreckage at the World Trade Center site. *Id.* In Plaintiff's view, the Work is "not merely the depiction of an unforgettable historical event, but also the product of considerable creativity." *Id.*

19

The Court finds that the second factor favors a finding of fair use.  There can be no dispute that the Work is a non-fictional rendering of an event of utmost historical importance, which Franklin created during the course of his duties as a news photographer.  Franklin did not create the scene or stage his subjects—to the contrary, he plainly acknowledged that the photograph "just happened."  While there can be no dispute that Franklin exhibited great artistry in carrying out his task—for which he has been rightfully recognized and rewarded—there can also be no dispute that the Work is a quintessential example of photojournalism.  Also weighing in Defendants' favor is the fact that the Work has been published since September 12, 2001.

Courts analyzing similar photographic works created for news gathering or other non-artistic purposes have found this factor to weigh in favor of fair use.  In *Katz v. Chevaldina*, No. 12 Civ. 22211, 2014 WL 2815496, at *1 (S.D. Fla. June 17, 2014), *adopted by*, 2014 WL 4385690 (S.D. Fla. Sept. 5, 2014), the court considered the defendant's publication of a critical blog post which incorporated a copyrighted photograph of the plaintiff.  The court concluded that the second factor weighed in the defendant's favor because the photograph captured the plaintiff in a public setting and was simply used to identify him, and there was "no evidence that the photographer influenced, *at all*, the Plaintiff's activity, pose, expression or clothing."  *Id.* at *8 (emphasis added).  The court went on to note that it could not be said that the photograph conveyed the photographer's ideas or emotions.  *Id.*; *see also Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 188 (D. Mass. 2007) (finding that the second factor weighed in favor of fair use because the plaintiff did not employ a creative process in photographing alleged mobster after arrest).  Accordingly, because the Work is factual and has been published, this factor favors a finding of fair use.  As mentioned above, however, this factor is rarely determinative.

c. **Factor Three:  The Amount and Substantiality of the Portion Used**

The third factor bearing on fair use is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  The question is whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying.  *Campbell*, 510 U.S. at 586 (quoting *Folsom*, 9 F. Cas. at 348); *see also HathiTrust*, 755 F.3d at 98 (stating that the third factor asks whether the copying used more of the copyrighted work than necessary and whether the copying was excessive).  "In general, 'the more of a copyrighted work that is taken, the less likely the use is to be fair.'"  *Swatch*, 756 F.3d at 89 (quoting *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998)).  As the Second Circuit has noted, however, there are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use.  *HathiTrust*, 755 F.3d at 98 (quoting *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986)).  "[T]he extent of permissible copying varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586-87.  Indeed, for some purposes, it may be necessary to copy the entire copyrighted work, and the third factor would not weigh against a finding of fair use in such circumstances.  *HathiTrust*, 755 F.3d at 98; *see, e.g.*, *Bill Graham Archives*, 448 F.3d at 613.  "The crux of the inquiry is whether 'no more was taken than necessary.'"  *HathiTrust*, 755 F.3d at 98 (quoting *Campbell*, 510 U.S. at 589).  Moreover, this factor "weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all—than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value."  *Fitzgerald*, 491 F. Supp. 2d at 188; *see also Katz*, 2014 WL 2815496, at *8.

The Court concludes that this factor is neutral.  Given the express purpose of commemorating the events of 9/11, it is not clear that Fox News' use of any less of the Work

would have ensured its audience's recognition of the iconic photograph.  *Cf. Fitzgerald*, 491 F.

Supp. 2d at 188 (deciding that this factor was "balanced between fair use and infringement"

based on the slight cropping of the photograph and the preservation of most of the "heart" of the

work); *Katz*, 2014 WL 2815496, at *8 (finding that the third factor was neutral even though the

defendant copied the entire copyrighted work because the work in question was a photograph);

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2002) (deciding that the third factor did

not favor either party because images used for a search engine database are necessarily copied in

their entirety for the purpose of recognition); *see also Dhillon v. Does 1-10*, No. 13 Civ. 1465

(SI), 2014 WL 722592, at *5 (N.D. Cal. Feb. 25, 2014) (finding that the third factor was neutral

where blog posted entire copyrighted headshot of state assembly candidate because "it would not

have been feasible in these circumstances for the defendant to have copied less than the entire

photo").  Therefore, the Court cannot conclude that the third factor favors either party.[18]

### d.  Factor Four:  The Effect of the Use Upon the Market for or Value of the Original

The fourth factor is "the effect of the use upon the potential market for or value of the

copyrighted work."  17 U.S.C. § 107(4).  In *Harper & Row*, the Supreme Court described this

factor as "undoubtedly the single most important element of fair use."  471 U.S. at 566.  This

factor "requires courts to consider not only the extent of market harm caused by the particular

actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort

engaged in by the defendant . . . would result in a substantially adverse impact on the potential

market' for the original."  *Campbell*, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer,

---

[18] As discussed above, the inquiry under the third factor is dependent on the purported purpose of the copyrighted work's use, which presents an issue of fact here.  The Court notes, however, that irrespective of whether the purpose of Fox News' use was the commemoration of 9/11 or the promotion of the Program, it still could not conclude as a matter of law that the third factor favored either party.

*Nimmer on Copyright* § 13.05[A][4] (1993)).  The Second Circuit has "made clear that '[the court's] concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use *usurps* the market of the original work.'"  *Cariou*, 714 F.3d at 708 (quoting *Blanch*, 467 F.3d at 258)).  "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop."  *Campbell*, 510 U.S. at 592.  The Second Circuit has concluded that an alleged infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original.  *Cariou*, 714 F.3d at 709; *see, e.g.*, *Castle Rock*, 150 F.3d at 145 (finding that a *Seinfeld* trivia book usurped the show's market because it substituted for a derivative market that a television program copyright owner would in general develop or license others to develop).  In conducting this analysis, courts are "mindful that '[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original,' even though 'the fair use, being transformative, might well harm, or even destroy, the market for the original.'"  *Cariou*, 714 F.3d at 709 (quoting *id.* at 145).

Furthermore, "[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."  *Am. Geophysical Union*, 60 F.3d at 929 (internal citations omitted).  As the Second Circuit has noted, however, "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder."  *Id.* at 930 n.17; *see also Bill Graham Archives*, 448 F.3d at 614.

23

Defendants contend that the fourth factor favors a finding of fair use because Plaintiff has not produced evidence that it lost any licensing revenue as a result of the use, or that Fox News ever attempted to oust Plaintiff from its licensing market, let alone that it has usurped such a market.  Defs. Mem. L. 23-24.[19]  NJMG counters that the unauthorized use here damaged the licensing market for the Work, and that widespread copying of the same sort would greatly diminish Plaintiff's copyright.  Pl. Opp. Mem. L. 23.

The Court finds that this factor weighs against fair use.  As discussed above, the Combined Image is not substantially transformative.  It does not present an "entirely different aesthetic" but instead relies upon the Work's original subjects and setting to retain the Work's historical meaning.  And it is this historical meaning that has allowed the Work to remain popular to this day, as evidenced by the fact that NJMG has raised more than $1 million in licensing revenue from the Work to date.  Indeed, there is no dispute that NJMG, which was "inundated" with licensing requests at the time of the Work's original publication, still maintains an active licensing program for the photograph, including by licensing the Work to media entities for editorial use, precisely the type of use Defendants urge they intended here.  Fox News' interest in the Combined Image therefore poses a very real danger that other such media organizations will forego paying licensing fees for the Work and instead opt to use the Combined Image at no cost.  Accordingly, given the predominance of the Work in the Combined Image, the posting on the Pirro Facebook Page poses a much greater danger to NJMG than simply the loss of licensing revenues from this one-time use.

---

[19] Defendants also claim that Plaintiff is aware of, but has done little to stop, widespread unlicensed uses of the Work, and that NJMG's "newfound and porous (or selective) enforcement" of its copyright in the Work implies that "stray internet uses" of the photograph are not substitutes for, and have not usurped the market for, the Work.  Defs. Mem. L. 24, 25.

The district court's analysis in *Fitzgerald* is instructive.  There the court found that the fourth factor "must go" in the plaintiff photographer's favor because CBS Broadcasting, Inc.'s ("CBS") use of photographs of an alleged mobster following his arrest was "paradigmatic of the only market the photographs could reasonably have:  licensing to media outfits."  491 F. Supp. 2d at 189.  The court noted that while there was no significant demand for "8x10 glossies" of a mobster, the market for media licenses for the photographs clearly existed.  *Id.*  Indeed, various media organizations used the photographs more than 20 times, resulting in over $60,000 in fees and settlements for the same kind of use as that employed by CBS.  *Id.*  While the Combined Image is, in the Court's view, marginally more transformative than the cropped image used in *Fitzgerald*, the continued demand for the Work for editorial use suggests that the purported use for commentary here was likewise paradigmatic of a primary market for the photograph.[20]

The fourth factor therefore weighs against a finding of fair use.

**e.  Overall Assessment**

Weighing the results together, in light of the purposes of copyright, the Court cannot conclude as a matter of law that Defendants' use of the Work was fair.  Material questions of fact exist concerning the purpose of the Combined Image's use, precluding a determination of the

---

[20] Finally, Defendants' argument that the fourth factor favors fair use because Plaintiff has not presented evidence that it lost even a single dollar of licensing revenue is unavailing.  As the Second Circuit stated in *Bill Graham Archives*, the court's role with respect to the fourth factor is to "look at the impact on *potential* licensing revenues for 'traditional, reasonable, or likely to be developed markets.'"  448 F.3d at 614 (emphasis added) (quoting *Am. Geophysical Union*, 60 F.3d at 930); *see also Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997) (noting that the plaintiff was not required to show a decline in the number of licensing requests for the work in question, but instead that there was a traditional, reasonable, or likely to be developed market for licensing the work).  And in *Castle Rock*, the Second Circuit found that the fourth factor favored *Seinfeld*'s production company where there was no evidence that the publication of the allegedly infringing trivia book diminished the show's profitability.  150 F.3d at 136.  The court noted that although the plaintiff evidenced little if any interest in exploiting the market for derivative works based on *Seinfeld*, the copyright law must respect that creative and economic choice. *Id.* at 145-46.

first statutory factor.  The second factor weighs in favor of fair use, but that factor is only rarely determinative and is not so in this case.  The third factor is neutral.  The fourth and most important factor weighs against fair use.  Accordingly, Defendants' motion for summary judgment must be denied.

**V.     Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment is DENIED. The Clerk of the Court is respectfully directed to terminate the motion.  Doc. 31.

It is SO ORDERED.

Dated:     February 10, 2015
           New York, New York

_____
Edgardo Ramos, U.S.D.J.

26